UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD EVERETT I., Jr.<br><br>Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL, Commissioner of Social Security,[1]<br><br>Defendant. | Case No. 5:19-cv-00523-KES<br><br>MEMORANDUM OPINION AND ORDER |

# I.
# PROCEDURAL BACKGROUND

Plaintiff Donald Everett I., Jr. ("Plaintiff") applied for Titles II and XVI Social Security disability insurance benefits in December 2014, alleging disability commencing October 1, 2008, with a date last insured ("LDI") of December 21, 2010. Administrative Record ("AR") 262-69. On April 13, 2018, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

("VE"). AR 38-68. On May 4, 2018, the ALJ issued an unfavorable decision. AR 14-37.

The ALJ found that Plaintiff suffered from medically determinable severe impairments including diabetes with peripheral neuropathy, degenerative disc disease, pancreatitis, osteoarthritis of the right knee, and bipolar disorder. AR 20. The ALJ considered the following medical opinion evidence about the functional limitations caused by these impairments:

- Psychological consultative examiner Dr. Kara Cross opined that Plaintiff's mental illness was non-severe (AR 542-43);
- State agency reviewing psychiatrist Dr. H. Amado opined that Plaintiff had some "moderate" limitations, so "perhaps" an RFC for "unskilled" would be "more appropriate" (AR 79-80, 83);
- Orthopedic consultative examiner Dr. Herman Schoene opined that Plaintiff could do "medium" work (AR 549); and
- State agency reviewing physician Dr. Joel Ross endorsed Dr. Schoene's opinions as consistent with the treating records (AR 78).

Synthesizing these opinions, the ALJ found that despite his impairments, Plaintiff had the residual functional capacity ("RFC") to perform "light" work with some additional limitations, including a limitation to "unskilled work in a nonpublic setting" to address limitations caused by Plaintiff's mental impairments. AR 22.

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could work as a mail clerk, routing clerk, or plastic products assembler. AR 30. The ALJ concluded that Plaintiff was not disabled, either from October 1, 2008, through his LDI of December 31, 2010, or from the date of his application (December 4, 2014) through the date of the ALJ's decision (May 9, 2018). AR 23, 31.

# II.
# ISSUE PRESENTED

This appeal presents the sole issue of whether the ALJ gave clear and convincing reasons for discounting Plaintiff's testimony regarding the limiting effects of his pain and mental illness. (Dkt. 25, Joint Stipulation ["JS"] at 4.)

It is the ALJ's role to evaluate the claimant's testimony regarding subjective pain or symptoms. See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Id. at 1112. An ALJ's assessment of symptom severity is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989).

If an individual alleges impairment-related symptoms, the ALJ must evaluate those symptoms using a two-step process. First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Treichler v. Comm'r of SSA, 775 F.3d 1090, 1102 (9th Cir. 2014) (citation omitted). Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only upon making specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996). If the ALJ's findings are supported by substantial evidence in the record, courts may not engage in second-guessing. Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

# III.
# SUMMARY OF RELEVANT EVIDENCE

A. **The Origin of Plaintiff's Impairments.**

Plaintiff was born in 1965. AR 551. He was diagnosed with depression in

1979. AR 537. He graduated from high school and completed two or three years of welding college in 1995 without special education services. AR 54, 297, 437, 538. In 2000, he began working in automotive sales, and he continued to do so until he was laid off, which per earnings records and Plaintiff's representations was in 2008 or 2009—although elsewhere Plaintiff claimed to be working after 2009. See AR 43-44, 273, 298, 458, 546; compare AR 644 (stating in January 2011 that "several weeks ago" he injured himself "at work").

According to Plaintiff, he experienced two major medical events in 2008. First, in August 2008, Plaintiff was hospitalized as a danger to self. AR 437. At that time, he had a history of depression, but he was not taking any medications to manage that condition. Id. He had struggled with alcoholism since he started drinking at age 19, with periods of sobriety that lasted only a few months. AR 437, 439, 538. He took classes for a "history of DUIs," and he reported a history of abusing harder drugs. AR 460. He could not remember what prompted his August 2008 hospital admission, but his girlfriend reported that he was intoxicated and acting erratically. AR 439. After a few days of "detox" and starting anti-depressants, Plaintiff was discharged "feeling much better." AR 437-38. His doctors opined that he would be "stable" if he complied with "medication and outpatient treatment." AR 438.

Second, sometime near the end of 2008, Plaintiff reports that he suffered an accident playing softball. AR 454, 562. He was running the bases when his "right knee gave way" and he "tumbled forward." AR 546. He dislocated a finger and reported a stiff shoulder. AR 454, 546. After leaving the hospital, he felt paralyzed, so he was taken back to the hospital where he was diagnosed with a fractured neck bone. AR 546, 562. According to Plaintiff, he underwent spinal fusion surgery about two weeks later to address this. AR 562.

According to Plaintiff's medical records, however, his spinal fusion surgery occurred in January 2010. AR 582. He told his doctors that he was working as a

4

"carpenter/contractor" and "developed neck pain from his job to where he is unable to raise his head from consistent muscle spasms." Id. Imaging showed "grade I spondylolisthesis" with some degenerative disc changes. AR 582-83. The fusion surgery was conducted to address degenerative disc disease, and the surgical records say nothing about a bone fracture. AR 584. Plaintiff was restricted against "sports" and "strenuous activities" until his follow-up appointment in two weeks. AR 618, 636.

A March 11, 2010 post-surgical evaluation noted, "Stable fusion C5, C6 and C4 with prosthetic discs in place." AR 587.

On March 18, 2010, Plaintiff reported that he was "hit in the side of his neck … with a flat iron then fell into doorway, hitting the right side of his neck." AR 638. He had been drinking. Id. At that time (i.e., more than a year after his claimed onset date), he had a full range of motion ("ROM") in his back without pain. AR 639.

A few months later in June 2010, Plaintiff claimed that he "fell 1-2 feet while walking and landed on a concrete surface." AR 641. Staff at the emergency room ("ER") determined that his ability to provide a history was "limited by intoxication and agitation," and he was unable to walk. Id. The diagnostic impression was "[p]robable chronic cervical strain." AR 641.

B. **Subsequent Mental Health Treatment.**

From August 2008 through August 2010, Plaintiff attended outpatient therapy. AR 450-60, 462-81. He temporarily stopped drinking in August 2008 but reported increased stress due to physical pain issues and financial issues, including being divorced three times. AR 440, 452-53. In October 2008, one objective of his treatment was to "work on career path," and he considered becoming a contractor.[2] AR 455. In May and October 2009, his attention, concentration, and

---

[2] He apparently accomplished this objective, because in February 2011, he

5

thought process were all assessed as within normal limits. AR 471, 473.

Around Thanksgiving 2010, Plaintiff started drinking again. AR 505. By February 2011, Plaintiff was "non-compliant on psych meds." AR 499. He was hospitalized again as a 5150 (i.e., danger to self or others). AR 504. At that time, he reported no suicidal ideations, but he had punched his father in the face and was "uncooperative" with the police. AR 505-06. He accused the officers of having an affair with his wife, and they tazed him. AR 505. He told the hospital staff that he was working as a contractor. Id.

Sometime in 2011, Plaintiff was incarcerated for 8 months. AR 467. He resumed outpatient therapy in January 2012 but had trouble paying for his prescriptions. AR 465, 467. He reported sobriety since February 2011. AR 466.

In July 2013, he was incarcerated again for 69 days for DUI. AR 462. He resumed outpatient treatment in October 2013, at which point he tried to stop drinking again. AR 462, 538. He was scheduled for a follow-up appointment in 2 months, but there is no record of more therapy in 2013. Id.

In fact, the next record dates from January 2015, at which time Plaintiff underwent a psychological evaluation. AR 536. At that time, he could not name any current treating psychologist or psychiatrist. AR 538. Nevertheless, he reported taking Lorazepam/Ativan (an anti-anxiety drug), Fluoxetine/Prozac (a selective serotonin reuptake inhibitor), and Zolpidem/Ambien (a sedative). Id. He told the examiner, Dr. Cross, that his pain, not his mental illness, precluded him from working. AR 537. He also reported four mental health hospitalizations, each occurring when he was intoxicated. AR 538. Despite this history, he reported that he could manage his own funds, relate with friends and family, ride the bus, use a cell phone, and leave the house alone. AR 539. Dr. Cross assessed no significant limitations on Plaintiff's vocational opportunities attributable to his mental

---

told medical sources that he was working as a contractor. AR 505.

condition. AR 542-43.

There are no subsequent treating records for mental illness other than records from Plaintiff's primary care doctors at Yucca Family Medical Care ("YFMC") who prescribed medications for him.

At the April 2018 hearing, Plaintiff reported that he was still drinking, sometimes five or six beers at a time. AR 54. He tried medical marijuana, but that did not work. AR 55.

**C. Subsequent Pain Treatment and Exertional Activities.**

In September 2008, Plaintiff was able to pursue hobbies such as building "choppers" and working on cars. AR 458. In April 2009, Plaintiff was able to take care of his parents who were in "poor health" while he was "off work due to stress." AR 453, 458.

In January 2011, Plaintiff went to the ER complaining of a "twisting injury" to his right knee that happened "several weeks ago … at work." AR 644. At that time, ER staff assessed his neck, back, and gait as normal. Id. After an x-ray, Plaintiff was diagnosed as suffering a knee sprain; he was given pain medication and crutches. AR 644-46.

In February 2011, Plaintiff returned to the ER (although he was currently in jail) still using crutches and complaining new knee pain. AR 647. He was given more pain medication and instructed to do "exercise for ROM with knee" three times daily. AR 648.

In March 2011, imaging of Plaintiff's knees revealed "mild to moderate osteoarthritis" on the right and no degenerative changes on the left. AR 493, 498. Imaging of Plaintiff's cervical spine revealed no acute fracture. AR 498.

There is a two-year gap in Plaintiff's treating record until April 2013. AR 651. He told ER staff that he was "cleaning out one of his renters apt and throwing away some trash when he was stuck in the back of the hand with dirty needles …. Pt states he went back to his workshop and was stuck a second time in the left palm

….." AR 658. At that time, he was able to walk. AR 656. He claimed pain where he was stuck, but he denied musculoskeletal, joint, and muscle pain. AR 652, 657.

In July 2013, while in prison, Plaintiff reported an accident involving a 300-pound inmate who fell on him with his "feet on [Plaintiff's] neck." AR 573. After being released, Plaintiff thought that he was "getting better then pt started working on his house and for the past 2 [days] has had a flare up of symptoms." Id. Desert Oasis Health Care declined to prescribe Norco until Plaintiff established a primary care relationship with a doctor. AR 575.

In August 2013, Plaintiff underwent more medical imaging of his cervical and lumbar spine. This testing showed his prior neck surgery (i.e., fusion of C4 to C6 with discectomies) and concluded his neck was "stable." AR 485. Doctors noted evidence of degenerative disc disease. Id.

In September 2013, Plaintiff fell off a ladder and reported neck, back, and left-ankle pain to the ER. AR 668-70. He was able to walk into the ER, and he displayed a full neck ROM. AR 670, 678. X-rays revealed no fractures, and he left with pain medication. AR 671, 680-82, 688.

After about a year, in August 2014 Plaintiff established a treating relationship with Yucca Family Medical Care ("YFMC"). AR 520. He obtained more imaging of his spine and knees which showed largely mild degenerative changes. AR 528-31.

Plaintiff next visited the ER in October 2014. He was at Walmart (or a McDonalds in a Walmart) when he felt light-headed and fainted after taking "a couple Ultrams," which are narcotic-like pain relievers. AR 693-700, 703. He told ER staff that he hit his head, but imaging revealed no head injuries. AR 704, 716. At the time, he endorsed neck pain, but no other joint or muscle pain. AR 695, 703. He told ER staff that he could conduct his activities of daily living independently, although he used a cane. AR 704.

In November 2014, Plaintiff returned to the ER complaining of another fall.

AR 576-77.  He reported walking with a cane when his right knee gave out.  AR 576.  A physical examination revealed a normal left knee and "right knee pain with ROM."  Id.  The ER recommended muscle strengthening exercises.  AR 577.

In December 2014, YFMC referred Plaintiff for specialized pain management.  AR 514.  Plaintiff reported that he was using Norco every 4-6 hours, such that he had run out and it was "too early" to refill his prescription.  AR 513.  His appointment was scheduled for May 2015.  AR 512.

Meanwhile, in January 2015, Plaintiff underwent a psychological evaluation that also evidences his physical condition at the time.  He reported that he could manage his own self-care and do some chores, like washing dishes, picking-up, and shopping.  AR 539.  Plaintiff told Dr. Cross that he used a cane, but he did not bring one to the evaluation, and he displayed an unimpaired gait.  AR 537, 540.

In February 2015, Plaintiff underwent an orthopedic evaluation by Dr. Schoene.  AR 545.  Dr. Schoene observed that Plaintiff used no assistive device and displayed a "normal" gait with the ability to walk on his toes and heels "without difficulty."  AR 547.  Plaintiff had a full or normal ROM in his neck, back, knees, and ankles.  AR 547-48.  He had normal motor strength and no atrophy.  AR 548.  After examining Plaintiff and multiple 2014 x-rays, Dr. Schoene opined that Plaintiff could do "medium" work.  AR 549.

In May 2015, Plaintiff had his initial appointment with pain care specialist Dr. Loomba at Global Pain Care ("Global").  AR 562.  Plaintiff told Dr. Loomba that he had tried many pain therapies unsuccessfully (including physical therapy,[3] epidural injections, chiropractic treatments, and massage), but there are no records of such therapies in the AR before May 2015.  Id.  Dr. Loomba ordered additional imaging of Plaintiff's spine which showed mild to moderate degenerative changes.

---

[3] A note dated June 4, 2010 states "Go to PT," but there are no records of any physical therapy sessions.  AR 469.

9

AR 557-58, 564. Plaintiff also signed a "narcotic contract," agreeing that he would only get narcotic pain medication from Dr. Loomba. AR 564.

At his follow-up Global appointment on June 15, 2015, Plaintiff complained of chronic neck and back pain that averaged 9/10 in intensity. AR 559-60. A physical examination revealed some spinal tenderness and increased pain with flexion and extension of the spine. AR 560. Plaintiff's motor strength, however, was 5/5, and a straight-leg raising test was negative. Id. Per Dr. Loomba's instruction, Plaintiff brought a note from YFMC indicating that it would not prescribe Norco anymore, so that all of Plaintiff's pain medications would come from one physician and one pharmacy. AR 561, 564, 923 (note).

A few days later on June 27, 2015, Plaintiff went to the ER complaining of toe pain about six weeks after getting a pedicure in a nail salon. AR 726-27. At that time, he endorsed drinking alcohol again. AR 728. The ER staff diagnosed him with cellulitis secondary to diabetes. AR 731.

On July 3, 2015, Plaintiff returned to Global. AR 880. The results of his physical examination were the same as in May, but he reported his pain as 10/10. AR 881.

On July 23, 2015, Plaintiff went to YFMC to follow up on his toe pain. AR 928. He was referred to a podiatrist, but there is no record that he pursued that referral. Id.

In August 2015, Plaintiff returned to Global and reported that his new medications were helping, reducing his pain to 8/10. AR 877. He received a steroid injection and achieved 25% pain relief for three weeks. AR 872, 875.

About a week after the injection, however, Plaintiff went to YFMC for "refills on all meds." AR 927.

On September 4, 2015, Plaintiff went to the ER complaining of abdominal pain. AR 740. A scan of his abdomen revealed a "markedly abnormal pancreas." AR 758. He was diagnosed as suffering from dehydration due to renal

insufficiency. AR 746. He was given intravenous hydration and discharged, at which point he left the ER walking. AR 753, 766.

Three days later he was back at the ER complaining of worsening abdominal pain. AR 766. He was diagnosed with duodenitis (inflammation of the duodenum, the first part of the small intestine). AR 772. After his condition "improved markedly," he was discharged with a prescription for Hydrocodone and instructions to follow up with his primary doctor. AR 770, 774, 787.

Two days later on September 9, 2015, he returned to Global. AR 872. He told Dr. Loomba that the ER had treated him for an infection and prescribed antibiotics, but he did not tell Dr. Loomba about the Hydrocodone. Id. Plaintiff rated his pain 7/10, and his physical examination was unchanged from May 2015. AR 973.

A few days later on September 14, 2015, Plaintiff was back in the ER complaining of ALOC (altered level of consciousness). AR 788. One of his housemates had called 911. AR 789. ER staff conducted a physical examination and assessed Plaintiff's back and extremities as "normal." AR 791. He was given two liters of NS [normal saline] and prepared for transfer to a facility for dialysis services. AR 792. He was diagnosed as suffering from renal insufficiency and mild pulmonary edema. AR 796, 808.

At Plaintiff's next Global appointment on October 8, 2015, he reported pain at 9/10, although he also claimed that medications were helping. AR 869. A physical examination noted no ankle problems. AR 807. Dr. Loomba increased his Norco. AR 870.

On the very same day, Plaintiff went to YFMC complaining of ankle pain and swelling that had started three weeks earlier. AR 925. He was referred to an endocrinologist, but there is no record that he pursued that referral. Id.

In November 2015, Plaintiff told Global that his pain was 7/10. AR 866-67. He received another injection for pain relief in December 2015. AR 861, 864.

On January 4, 2016, Plaintiff told Global that his pain had increased to 10/10, but he also reported that medication was helping. AR 861. His physical examination was unchanged from May 2015, and there is no mention of him using a cane. AR 862.

On January 28, 2016, Plaintiff told YFMC that he was still bothered by a "spinal cord injury from a baseball accident." AR 921. He was there "for Norco" and walking with a cane. Id.

The next day, Plaintiff told Global that his pain was back down to 8/10 and his medications were helping. AR 858. Dr. Loomba changed Plaintiff's Norco prescription to Percocet, but Plaintiff did not disclose that he had received a Norco prescription from YFMC the prior day. AR 859. Global observed for the first time that Plaintiff was using a cane to walk. Id.

On February 12, 2016, Plaintiff went to YFMC complaining of left-leg pain due to a fall he suffered five days earlier. AR 919. YFMC referred him to the ER. Id.

At the ER, Plaintiff complained of left ankle pain after "tripping" in his kitchen. AR 820, 824; compare AR 915 (ankle injury happened while walking to the refrigerator; he "didn't trip, fall, kick, or any other trauma. He just heard a crush and fell down.") Plaintiff denied neck or back pain, displayed a normal ROM, and arrived at the ER ambulatory. AR 822, 829. X-rays showed a "distal fibula fracture." AR 824. He departed with a leg splint and crutches to use temporarily. AR 831-32.

He returned to YFMC a few days later on February 16, 2016. AR 917. He told YFMC that he went to the ER, but the "wait was too long" so he left. Id. YFMC observed that Plaintiff appeared "drowsy" and was "slurring his words," accompanied by his mother. AR 917-18. YFMC re-applied his leg splint and referred him to orthopedics for a leg cast. AR 918. YFMC also refilled his Norco prescription. Id.

1    On March 8, 2106, Plaintiff underwent an open reduction and internal
2 fixation procedure to fix his broken ankle, after which he was put in a cast. AR
3 851.
4    On March 24, 2016, he returned to Global, reporting pain at 9/10, wearing a
5 cast on his left ankle, and using crutches. AR 855-56.
6    On April 5, 2016, he returned to YFMC, advised them of his surgery, and
7 received another Norco refill. AR 909-10. He also reported having passed out
8 twice due to Zanaflex/Tizanidine (a muscle relaxant). AR 909.
9    A few days later, he went to Global for another pain injection to address
10 pack and neck pain. AR 853. He reported that the injection provided 70-80% pain
11 relief that lasted three weeks. AR 850.
12    Nevertheless, about a week later on April 26, 2016, he returned to YFMC
13 for another Norco refill. AR 908, 913. At that time, he had a full range of neck
14 motion and "normal" motor strength in his lower extremities. AR 913.
15    In May 2016, he told Global that his pain had been reduced to 5/10. AR
16 850-51. He was still wearing a walking boot on his left foot and using a cane. AR
17 851.
18    On June 7, 2016, Plaintiff told YFMC that he was experiencing
19 "uncontrolled leg pain" and needed medication refills, including Norco. AR 905-
20 06. A few days later on June 20, 2016, he returned to Global and reported
21 extensive pain with insufficient relief from medication. AR 847-48. By this point,
22 Dr. Loomba had learned that Plaintiff had been receiving Norco prescriptions from
23 other physicians and had last filled a Norco prescription on June 7. AR 848.
24 When Dr. Loomba asked Plaintiff about when he had last received a Norco
25 prescription, Plaintiff lied and said that it was "probably last month from a dentist"
26 and his recent prescription was for ibuprofen. AR 848. Dr. Loomba discontinued
27 his MS Contin and Percocet prescriptions and discharged him from Global's
28 patient roster for breaching the narcotics contract. Id.

In July 2016, Plaintiff returned to YFMC complaining of "chronic body pain." AR 902. Although a physical examination was largely normal, he received a Norco refill. AR 903.

At his August 2016 YFMC appointment, he reported that his "medications were stolen," and he received more Norco. AR 899.

In September 2016, Plaintiff had a supple neck, full ROM, normal motor strength, and only mild foot tenderness. AR 896. There is no mention of him using a cane. Id.

In October and November 2016, however, Plaintiff complained of neck, knee, and ankle pain, and he used a cane. AR 891, 894. In December 2016, he requested another referral to the pain care clinic. AR 889.

The final treating records are from January and March 2017. YFMC observed that Plaintiff had normal physical examination results but walked with a cane. AR 883, 885.

## IV.

## DISCUSSION

### A. Summary of Plaintiff's Subjective Symptom Testimony.

Plaintiff testified that he last worked in 2009 or early 2010 for Yucca Valley Ford. AR 43. He testified that the psychiatric problems he was experiencing when he stopped working were worse in 2018. AR 44. He described his then-present symptoms as including auditory hallucinations in the last 18 months, severe depression, panic attacks, and sleeplessness. AR 44, 46. He had panic attacks "more often than not," despite taking Alprazolam/Xanax. AR 44-45. He endorsed having depressive episodes that could last a week or longer, during which time he ignored personal self-care and his pet dog. AR 46.

Regarding his chronic pain, Plaintiff testified that his January 2010 neck surgery initially provided some relief, but then "stuff got worse." AR 47. He felt "sharp, shooting" pain in his neck that radiated down his back to his hips and

tailbone. AR 48. His lower back pain radiated all the way to his feet. Id. He testified that his neck and pack pain were "constant" and ranged between 4/10 to 9/10. AR 48-49. He testified that his right knee occasionally "pops out," making it "hard to put weight on the right knee," which overburdens his left ankle. AR 49. Sometimes, he could not bend because of pain caused by his pancreatitis. AR 50. His left ankle was in constant pain, despite the surgically repaired fracture. AR 51. He testified that he used a cane "off and on" since "the knee injury" (which he does not identify), but he did not have to use it often. Id.

Plaintiff blamed his depression for being unable to remember people he has known, forgetting things, and being unable to hold a thought in his mind for a long period of time. AR 53. His last DUI conviction was in 2015, and he had a felony conviction for pushing someone and causing great bodily injury. AR 55.

Plaintiff also completed a Function Report in January 2015. AR 312. He reported problems with all areas of personal care, but he was able to feed his dog. AR 313. He indicated that he did no household chores and "cannot finish anything due to pain." AR 314. He reported that he "rarely" went out and denied using public transportation. AR 315. He could only walk 10 feet before needing to rest for one or two hours. AR 317. He stated that he did not drive due to "medications and pain," not mentioning that his license had been revoked due to multiple DUIs. AR 315. He met with "social groups" twice a week. AR 316. He indicated that he had been prescribed a cane and brace "5 years ago" (i.e., in approximately January 2010) and used those aids "almost every day." AR 318.

### B. Summary of Relevant Administrative Proceedings.

The ALJ summarized Plaintiff's testimony. AR 22-23. The ALJ found that his statements "concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." AR 23.

As reasons supporting this conclusion, the ALJ found that **[1]** Plaintiff's

testimony was inconsistent with the objective medical evidence and other evidence. AR 27. The ALJ also pointed to **[2]** the "routine, conservative care" Plaintiff received both for his mental and physical health. AR 24-25. The ALJ discussed both gaps in treatment and the nature of the treatment received (i.e., medication rather than surgeries or hospitalizations). AR 27. The ALJ also discussed **[3]** how Plaintiff made inconsistent statements about his ability to ambulate and need for a cane. AR 27. Finally, the ALJ noted **[4]** that none of Plaintiff's treating doctors had provided opinions restricting Plaintiff from any work activities. Id.

C. **Analysis of the ALJ's Reasons.**

    a. Reason One: Lack of Objective Support.

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony," ALJs may consider that factor in their analysis. Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

The results of Plaintiff's physical examinations were largely unremarkable. Often during his period of claimed disability due to back and neck pain, he denied such pain and exhibited a full ROM. See, e.g., AR 639, 652, 657, 547-48, 822, 829, 913, 896. X-rays and other scans showed mild degenerative disc disease and arthritis, but not physical changes so significant that they would be expected to cause disabling pain—e.g., pain that prevents Plaintiff from walking for more than 10 feet without at least an hour's rest. See, e.g., AR 644-46, 493, 498, 485, 671, 680-82, 688, 528-31, 557-58, 564. This was a clear and convincing reason to discount Plaintiff's testimony.

    b. Reason Two: Conservative Treatment.

A conservative course of treatment can provide reason to discount a plaintiff's subjective opinion testimony about the severity of an impairment. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

Regarding Plaintiff's mental health, the ALJ pointed out that the AR

16

contains evidence of a psychiatric hospitalization in August 2008 which coincided with an episode of intoxication. AR 26, citing AR 437-48. Plaintiff obtained treatment after this, and his mood stabilized with medications throughout 2009-2011. AR 26, citing AR 456, 468-69, 471, 473. During this time, Plaintiff was able to keep working. See, e.g., AR 458 (working in September 2008); AR 546 (working in February 2009); AR 582 (working as a contractor in January 2010); AR 644 (working in January 2011 when he sustained a knee injury); AR 505 (working as a carpenter in February 2011 prior to his arrest); AR 658 (working as a landlord in April 2013, cleaning out a renter's apartment and maintaining a work shop); AR 573 (working on house in November 2014).[4] Plaintiff's second 5150 hospitalization on February 23, 2011, also occurred after a "relapse" of his alcoholism. AR 505.

The ALJ correctly found "minimal evidence of [mental health] treatment throughout the remainder of the record" after 2011 except for medications prescribed by Plaintiff's primary care clinic, YFMC. AR 26-27. In 2015, Plaintiff told Dr. Cross that the reason he was not working was physical, not mental. AR 537. Thus, the ALJ's conclusion (i.e., that Plaintiff's minimal mental health treatment was inconsistent with what one would expect if someone were suffering from disabling mental illness) is supported by substantial evidence. AR 27. It provides a clear and convincing reasons to discount Plaintiff's testimony about the limiting effects of his mental illness.

Regarding pain treatment, the ALJ pointed out gaps in treatment, unremarkable findings at physical examinations, and recommendations over the course of years for pain medication, but not for more surgery. AR 24-25, 27. Per the ALJ, Plaintiff's neck and back pain responded well enough to steroid injections

---

[4] Despite these references to work, Plaintiff has denied working after 2008 (see AR 298), and his earnings records show no earnings after 2008. See AR 273.

that he rarely complained of it after 2015. AR 27. While the Court disagrees with this characterization of the record, it <u>is</u> true that during 2016, while Plaintiff sometimes complained of chronic pain, sometimes he did not (AR 822, 829), and he appears not to have sought or requested any treatment other than pain medication. Furthermore, any error here was harmless given the ALJ's other clear and convincing reasons for discounting Plaintiff's testimony, as described herein.

      c. <u>Reason Three</u>: Inconsistent Statements about Cane Use.

Where a claimant asserts that he/she must use a cane (although there is no evidence of medical necessity) or displays a limp only periodically, such facts support a finding that the claimant is exaggerating his/her impairments. <u>See, e.g.</u>, <u>Rojas v. Astrue</u>, No. 10CV2461 JLS (RBB), 2012 U.S. Dist. LEXIS 36748, at *42 (S.D. Cal. Mar. 19, 2012) (holding that ALJ gave clear and convincing reason for discounting claimant's subjective symptom testimony where the ALJ described how the claimant used a cane at a consultative evaluation and limped without it, although there was "no medical basis for Plaintiff's cane use").

Plaintiff argues that the ALJ failed to identify a true inconsistency. (JS at 10.) According to Plaintiff, he had good days and bad days, explaining his sporadic use of a cane. (<u>Id.</u>)

Plaintiff's representations regarding his cane use were inconsistent, providing a further clear and convincing reason to discount his testimony. In 2015, Plaintiff reported that a doctor had prescribed a cane for him in 2010, and he used one "almost every day." AR 318. There are no treating source records from 2010 recommending, let alone prescribing, a cane. In January 2015—the same month that he claimed that he used a cane almost every day—he did not bring one to a psychological evaluation, and his gait was unimpaired. <u>See</u> AR 537, 540. Likewise, he did not bring a cane to a February 2015 orthopedic evaluation, and he displayed a normal gait. AR 545, 547. Plaintiff's medical records do not mention a cane after that point until January 2016, when Plaintiff was seeking Norco from

| | |
|---|---|
| 1 | both YFMC and Global, in violation of the agreement he signed.  See AR 859, |
| 2 | 921.  As for the period between 2010 and 2015, Plaintiff's records do not support |
| 3 | his claim that by 2015, he used a cane "almost every day."  To the contrary, in |
| 4 | 2013, Plaintiff was "working on his house," climbing ladders, and exhibiting 5/5 |
| 5 | motor strength in his lower extremities.  AR 573, 668-71. .  This is not consistent |
| 6 | with using a cane "almost every day" as of January 2015.  AR 318. |
| 7 | d.  Reason Four: Doctors' Failure to Restrict. |
| 8 | Plaintiff argues that the ALJ unreasonably expected Plaintiff's treating |
| 9 | sources to provide opinions about work restrictions.  (JS at 10.)  In August 2008, |
| 10 | Charter Oak Hospital stated that Plaintiff was "still not able to be released for |
| 11 | work," demonstrating that treating sources can and do provide such opinions when |
| 12 | appropriate.  AR 468.  The ALJ correctly noted that none of Plaintiff's subsequent |
| 13 | treating records provide similar work-related restrictions.  While alone this reason |
| 14 | might not be clear and convincing, it adds weight to the ALJ's conclusion that |
| 15 | Plaintiff's subjective symptom testimony was exaggerated. |
| 16 | Plaintiff argues that the ALJ overlooked Dr. Amado's opinion that Plaintiff |
| 17 | could perform "detailed instructions clearly explained" but "permitting the full |
| 18 | range of unskilled work, including work requiring reasoning level 2."  (JS at 9 |
| 19 | [citing Zavalin v. Colvin, 778 F.3d 842, 847 (9th Cir. 2015)].)  To the extent |
| 20 | Plaintiff argues that the ALJ did not properly consider Dr. Amado's opinion, |
| 21 | Plaintiff does not explain how a "full range of unskilled work" conflicts with Dr. |
| 22 | Amado's opinion that Plaintiff could learn and retain most detailed instructions |
| 23 | clearly explained. |
| 24 | To the extent Plaintiff argues that the ALJ here erred in the same way |
| 25 | described in Zavalin: The plaintiff in Zavalin suffered from cerebral palsy, a |
| 26 | learning disorder, and a speech impairment, and the panel held that the ALJ erred |
| 27 | by failing to ask the VE how a person who could do only "simple jobs" could meet |
| 28 | Level 3 Reasoning requirements.  Id. at 844.  Here, assuming there is a conflict |

between a limitation to "unskilled" work and Level 3 Reasoning, the ALJ relied on the VE's testimony to find that Plaintiff could work as routing clerk, DOT 222.687-022 (50,000 such positions in the national economy), which requires Level 2 Reasoning.  See AR 30; see also Gutierrez v. Comm'r of SSA, 740 F.3d 519, 529 (9th Cir. 2014) (finding 25,000 national jobs sufficient to be "significant" under 42 U.S.C. § 1382c(a)(3)(B)[5]).

# IV.
# CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED:  March 23, 2020

_____
KAREN E. SCOTT
United States Magistrate Judge

---

[5] Section 1382c(a)(3)(B) defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."